UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                                    Chapter 11

27 Putnam Ave LP, *et al.*,[1]                                              Case No.: 19-13412 (RG)
                                                                                            Jointly Administered
             Debtors.
-----------------------------------------------------------x
27 Putnam Ave LP, 423 Grand Ave LP,
429 Grand Ave LP and 90 Downing St LP,

             Plaintiffs,

             v.                                                                Adv. Pro. No.: _____

JOHN DOE and JANE DOE,

             Defendants.
-----------------------------------------------------------x

Plaintiffs 27 Putnam Ave LP, 423 Grand Ave LP, 429 Grand Ave LP and 90 Downing St LP (collectively, "Plaintiffs" or "Debtors"; individually, each "Debtor" or "Plaintiff"), by their attorneys, Rosenberg & Estis, P.C., as and for their Complaint against the above-named defendants (collectively, "Defendants"), allege as follows:

## SUMMARY OF THE ACTION

1. Each Debtor owns an adjacent apartment building in the Clinton Hill neighborhood of Brooklyn, as follows: 27 Putnam Ave LP owns the property located at 27-29 Putnam Avenue ("27 Putnam"), 423 Grand Ave LP owns the property located at 423-427 Grand Avenue ("425 Grand"), 429 Grand Ave LP owns the property located at 429-435 Grand Avenue ("435 Grand"), and 90 Downing St LP owns the property located at 88-100 Downing Street (90 Downing;

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 27 Putnam Ave LP (7503); 423 Grand Ave LP (7503); 429 Grand Ave LP (7503); 90 Downing St LP (7503).

RE\23448\0030\3180245v10

collectively, the "Buildings"). From approximately December 1997 through February 2002, the Buildings underwent a four-year substantial rehabilitation project (the "Project").

2. This is an adversary proceeding which seeks a declaratory judgment that: (a) the Buildings were permanently removed from rent regulation jurisdiction of the Emergency Tenant Protection Act ("ETPA") upon completion of the Project because they were "substantially rehabilitated" within the meaning of the ETPA; and (b) Plaintiffs are entitled to reset and charge prevailing market rents for certain 46 units in the Buildings upon vacatur of tenants currently occupying these units, which were previously subject to rent regulation pursuant to the federal HOME Investment Partnership Program (the "HOME Program"), as set forth in detail below.

## THE PARTIES

3. Plaintiff 27 Putnam Ave LP is a Delaware limited partnership with a business address at 155 Water Street, 2nd Floor, Brooklyn, New York 11201.

4. Plaintiff 423 Grand Ave LP is a Delaware limited partnership with a business address at 155 Water Street, 2nd Floor, Brooklyn, New York 11201.

5. Plaintiff 429 Grand Ave LP is a Delaware limited partnership with a business address at 155 Water Street, 2nd Floor, Brooklyn, New York 11201.

6. Plaintiff 90 Downing St LP is a Delaware limited partnership with a business address at 155 Water Street, 2nd Floor, Brooklyn, New York 11201.

7. Upon information and belief, defendants John Doe and Jane Doe are residents of the State of New York and comprise all of the tenants/occupants of the Buildings' residential units.

## JURISDICTION AND VENUE

8. On October 25, 2019, each of the Debtors filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

9. On November 1, 2019, the Court entered an Order consolidating these Chapter 11 cases under Case No. 19-13412.

10. New York courts have subject matter jurisdiction over the rent regulatory issues raised herein and this Court has subject matter jurisdiction over this adversary proceeding pursuant to 18 U.S.C. § 2201 and 28 U.S.C. §§ 157 and 1334 because it arises under, in and/or relates to the Debtors' Chapter 11 case herein.

11. This is a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and this Court has jurisdiction to hear and to determine this proceeding and to enter a final order and judgment.

12. In the event that this Court or any other Court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Debtors' bankruptcy case and will have a material impact on the administration of Debtors' estate.

13. Debtors consent to entry of final orders by this Court in this adversary proceeding pursuant to F.R.B.P. 7008. Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders on judgments consistent with Article III of the United States Constitution.

14. This Court is the proper venue pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## FACTUAL ALLEGATIONS

**A.    The Buildings**

15. The Buildings are adjacent pre-World War II residential apartment buildings.

16. The Buildings contain a total of 128 units; to wit, 29 Putnam has 20 units; 90 Downing has 41 units; 425 Grand has 37 units; and 435 Grand has 30 units.

17. In 1984, the Board of Estimate of the City of New York designated each of the Buildings as "Urban Development Action Areas" pursuant to § 693 of the General Municipal Law, finding that "the present status of the area tends to impair or arrest the sound growth and development of the municipality."

18. Notwithstanding the fact that the Buildings were officially deemed to be blighted in 1984, no rehabilitation work took place in the Buildings until 1997/1998.

**B.     Tax Programs and Benefits**

19. The Buildings are participants in (a) J-51 real property tax exemptions and abatements program ("J-51 Program")[2] and (b) the HOME Program.

20. In New York City, both J-51 Program and HOME Program are administered by the New York City Department of Housing Preservation and Development ("HPD").

21. J-51 Program provides owners of residential multiple dwellings with tax exemption and/or abatement benefits of up to 34 years in exchange for performing qualifying renovations of the subject dwellings.

22. All 128 units in the Buildings received J-51 Program benefits, which are set to expire on June 30, 2033.

23. The HOME Program provides owners of residential multiple dwellings with federal low-interest loans to perform major capital improvements to the subject dwellings (the "HOME Loans") in exchange for reserving these units for tenants with qualifying incomes under the HOME Program, which terms are memorialized in recorded agreements with HPD.

---

[2] Real Property Tax Law ("RPTL") § 489, as implemented by New York City Administrative Code § 11-243, (colloquially known as "J-51") imposes a rent regulation obligation on all apartments in buildings receiving J-51 real estate tax benefits (with the exception of co-ops and condos).

24.     52 units in the Buildings were designated HOME Program units (the "HOME Units") and are subject to restrictions memorialized in the HOME Written Agreements, dated March 10, 1998 (collectively, the "HOME Agreement").[3]

25.     The HOME Program's regulatory restriction period expired pursuant to the terms of the HOME Agreement and is of no further force and effect.

26.     Paragraph 17 of the HOME Agreement provides that, to confirm the expiration of the HOME Program, HPD must deliver a recordable document to that effect to Plaintiffs.

27.     HPD has delivered a recordable instrument to Plaintiffs confirming expiration of the HOME Program's regulatory restriction period.

**C.    The AOD**

28.     Under prior management, the Buildings were mismanaged, which resulted in a lawsuit by the Building's tenant association in New York State Supreme Court County of Kings.

29.     In addition, on March 17, 2017, the Office of the Attorney General ("OAG") launched an official inquiry and issued investigatory subpoenas against the prior ownership of the Buildings.

30.     Shortly after OAG launched its inquiry, the Buildings' management changed when DS-CREF3 Clinton Mezz Note Byer LLC ("Mezz") acquired the mezzanine debt encumbering the equity interest held in Plaintiffs and, as part of the acquisition, Mezz's affiliate, Clinton Hill Mezz Borrower Lender GP LLC ("New Owner GP"), became the sole, non-economic general partner of Clinton Hill Mezz Borrower LP, which is the sole owner of the equity interest in Plaintiffs.

---

[3] A list of the HOME Units is annexed hereto as **Exhibit A**.

31. Following the change in management of the Buildings, New Owner GP and OAG negotiated and entered into an Assurance of Discontinuance, dated September 19, 2019 (the "AOD").

32. In paragraph 40 of the AOD, Plaintiffs agreed to recalculate and register with the New York State Division of Housing and Community Renewal ("DHCR") rents for 33 IAI Units, as the term is defined in the AOD.

33. Plaintiffs complied fully with the AOD and registered recalculated rents for the IAI Units.

34. Six of those 33 IAI Units are also subject to the HOME Program ("HOME IAI Units"[4]; the remaining 46 HOME Units are hereinafter referred to as the "46 HOME Units"[5])

**D.    The Legal Framework for
       Substantial Rehabilitation**

35. New York City apartment buildings constructed prior to 1974 are subject to rent stabilization pursuant to ETPA, unless a statutory exemption applies.

36. One such exemption is set forth in both ETPA § 5(a)(5) and in § 2520.11 of the Rent Stabilization Code ("RSC"), the implementing regulation of the ETPA, which exempts housing accommodations in buildings that have been "substantially rehabilitated" after January 1, 1974.

37. Pursuant to § 2527.11 of the RSC, the DHCR may issue operational bulletins establishing criteria to exempt buildings from rent stabilization as a result of substantial rehabilitation.

---

[4] A list of the HOME IAI Units is annexed hereto as **Exhibit B**.
[5] A list of the 46 HOME Units is annexed hereto as **Exhibit C**.

- 6 -

38. Pursuant to DHCR's Operational Bulletin 95-2, to effectuate "substantial rehabilitation" within the meaning of ETPA (as implemented by the RSC), the following two criteria must be satisfied.

39. <u>First</u>, the rehabilitation must take place "in a building that was in a substandard or seriously deteriorated condition."

40. <u>Second</u>, at least 75% of the 17 enumerated building-wide and apartment systems must have been "completely replaced with new systems" or "made as new," to wit: (1) plumbing, (2) heating, (3) gas supply, (4) electrical wiring, (5) intercoms, (6) windows, (7) roof, (8) elevators, (9) incinerators or waste compactors, (10) fire escape/fire suppression, (11) interior stairways, (12) kitchens, (13) bathrooms, (14) floors, (15) ceilings and wall surfaces, (10) painting or exterior façade repair and (17) doors and frames.

41. If the building does not have all of the enumerated systems, then the 75% requirement applies only to the systems that the building actually has.

42. In addition, DHCR codified three exceptions to the requirement that a particular building system be replaced, *i.e.* where a particular component of the building or system: (1) "has recently been installed or upgraded;" or (2) "is structurally sound and does not require replacement;" or (3) "the preservation of the particular component is desirable or required by law due to its aesthetic or historic merit." Operational Bulletin 95-2; RSC § 2520.11(e).

**E.    The Buildings Were in Substandard
       Or Seriously Deteriorated Condition
       When the Project Was Commenced**

43. From approximately December 1997 through February 2002, the Buildings underwent a comprehensive four-year rehabilitation project (the "Project"), which was partially funded by certain Participation Loan Program loans (collectively, the "PLP Loans"), in addition

to the HOME Loans, and which authorizes HPD to facilitate rehabilitation financing for dilapidated multiple dwellings.

44. When the Project was commenced, the Buildings were in substandard or seriously deteriorated condition within the meaning of Operational Bulletin 95-2, as evidenced by, *inter alia,* the following: (1) the PLP Loans would not have been granted if the Buildings were not in substandard or seriously deteriorated condition; (2) the Buildings were officially deemed blighted by the City in 1984 and sold for nominal amounts after foreclosure by HPD; (3) notwithstanding the fact that the Buildings were deemed to be blighted in 1984 and required immediate rehabilitation, the Buildings did not undergo any renovation work for the next 12 years from 1984 until the Project was commenced in 1997/1998; (4) all of the building-wide and apartment systems were well beyond their useful lives and needed complete replacement when the Project was commenced; and (5) the scope of the rehabilitative work done in connection with Project indicates that the Buildings' condition at the time warranted comprehensive rehabilitation.

45. Of the 17 building systems enumerated in the Operational Bulletin 95-2, each of the Buildings contained only 15 of these systems, *i.e.* none of the Buildings contained any incinerators, waste compactors or elevators both before commencement or after completion of the Project.

46. In addition, because the Buildings do not have elevators, their interior stairways are structurally part of the Buildings and cannot be removed (or replaced). As such, only 14 of the below-referenced building systems are applicable and relevant for purposes of Operational Bulletin 95-2

47. During the four-year Project, each of the following 14 relevant building systems was completely replaced or renovated in all four Buildings:

1. <u>Plumbing:</u>  complete replacement.

2. <u>Heating:</u>  complete replacement.

3. <u>Gas Supply:</u>  complete replacement.

4. <u>Electrical Wiring:</u>  complete replacement.

5. <u>Intercoms:</u>  complete replacement.

6. <u>Windows:</u>  complete replacement.

7. <u>Roof:</u>  complete replacement.

8. <u>Elevators:</u>  Not applicable (no elevator service in any of the Buildings).

9. <u>Incinerators or waste compactors:</u>  Not applicable (no incinerators or waste compactors present in any of the Buildings)

10. <u>Fire Escape/Fire Suppression:</u>  complete renovation (which qualifies pursuant to applicable rules in lieu of complete replacement).

11. <u>Interior Stairways:</u>  complete renovation.

12. <u>Kitchens</u>**:** complete replacement.

13. <u>Bathrooms:</u>  complete replacement.

14. <u>Floors:</u>  complete replacement.

15. <u>Ceilings and Wall Surfaces:</u>  complete replacement.

16. <u>Pointing or Exterior Facade Repair:</u>  complete pointing.

17. <u>All Doors and Frames:</u>  complete replacement.

48. In addition, although for the reasons set forth above, interior stairways are not applicable for the purposes of Operational Bulletin 95-2 and should not be counted as part of the total number of building systems in the Buildings, they, too, have been completely renovated within the meaning of Operational Bulletin 95-2.

49. Therefore, the Project resulted in complete replacement of all 14 (i.e. 100%) of the relevant enumerated building systems in each of the four Buildings, including all ceilings, flooring

- 9 -

and plasterboard or wall surfaces in the Buildings' common areas, and all building systems comply with all applicable building codes and requirements.

F. **The Effects of Substantial Rehabilitation and Expiration of HOME Program and J-51 Benefits on the Buildings' Rents**

50. As pre-1974 multiple dwellings, the Buildings were subject to ETPA rent stabilization jurisdiction prior to the commencement of the Project.

51. As a result of substantial rehabilitation of the Buildings, all 128 units in the Buildings became permanently exempt from ETPA rent stabilization jurisdiction upon completion of the Project.

52. In addition, although all 128 units in the Buildings received J-51 Program benefits (and, as a result, became subject to J-51 rent stabilization, which expires on June 30, 2033), the 52 HOME Units were *not* made subject to J-51 rent stabilization jurisdiction upon the completion of the Project because rent regulation pursuant to the HOME Program constituted a temporary exemption from J-51 rent stabilization for so long as the HOME Program rent regulations were in effect.

53. To wit, pursuant to J-51 statutes and HPD's J-51 rules, the HOME Program fully satisfied the requirement that dwelling units receiving J-51 benefits shall be subject to rent regulation pursuant to "any federal law providing for rent supervision or regulation by HUD or any other federal agency" (28 RCNY § 5-03 (f)(1)(iv)); *i.e.,* the HOME Program constituted "any federal law providing for rent supervision or regulation."

54. Therefore, the HOME Units became subject to J-51 rent stabilization jurisdiction -- *for the first time* -- upon expiration of the HOME Program.

- 10 -

55. Because the HOME Units were permanently exempt from the ETPA following completion of the Project, these units have no rent stabilized rent history establishing base rent, with the exception of HOME IAI Units, which Plaintiffs agreed to address separately in the AOD, as set forth above.

56. Consequently, upon expiration of the HOME Program, Plaintiffs would be entitled to charge prevailing market rents for the 46 HOME Units, which rents would be registered with the DHCR as the base rents from which future rent-stabilized increases would apply pursuant to RSC § 2521.1(h) for the duration of J-51 rent regulation.[6]

57. However, although Plaintiffs are entitled to reset the rents for the 46 HOME Units immediately upon expiration of the HOME Program, Plaintiffs are not seeking to immediately reset rents for the 46 HOME Units and, instead, seek relief authorizing them to reset these rents upon vacatur of tenants currently occupying the 46 HOME Units.

58. Paragraph 17 of the HOME Agreement provides that, in order to confirm the expiration of the HOME Program, HPD must deliver an appropriate recordable document to Debtors.

59. HPD has delivered a recordable instrument to Plaintiffs confirming expiration of the HOME Program's regulatory restriction period.

60. However, although Plaintiffs provided HPD with proof of prevailing rents for the HOME Units, HPD stated that it does not have the authority to set rents upon the expiration of the HOME Program's regulatory restriction period.

---

[6] RSC § 2521.1(h) provides that the initial legal regulated rent under these circumstances: "[s]hall be the rent charged the initial rent-stabilized tenant or the lawful rent charged and paid on April 1, 1984, whichever is later, and shall not be subject to a fair market rent appeal pursuant to § 2522.3 of this Title." After the HOME Program rents expire, the market rents charged will become the "initial legal regulated" J-51 stabilized rents.

## COUNT I

### Declaratory Judgment that the Buildings Were Substantially
### Rehabilitated and Not Subject to the ETPA Jurisdiction

61. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully incorporated herein.

62. The Buildings were in substandard or seriously deteriorated condition when the Project was commenced.

63. The Project resulted in complete replacement of 75% or more of the enumerated building systems in each of the four Buildings, including all ceilings, flooring and plasterboard or wall surfaces in the Buildings' common areas.

64. A justiciable controversy exists with respect to the allegations set forth above necessitating a declaration of Plaintiffs' rights and remedies in connection with the Buildings' regulatory status.

65. Based on the foregoing, Plaintiffs are entitled to a declaration pursuant to 18 U.S.C. § 2201 that the Buildings were "substantially rehabilitated" within the meaning of the ETPA and Operational Bulletin 95-2, which resulted in permanent removal of all units in the Buildings from the ETPA rent regulation jurisdiction.

## COUNT II

### Declaratory Judgment that Plaintiffs May Reset Rents for
### 46 HOME Units Upon the Expiration of the HOME Program
### and Upon Vacatur of Tenants Currently Occupying These Units

66. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully incorporated herein.

67. The HOME Units became subject to J-51 rent stabilization jurisdiction for the first time upon expiration of the HOME Program because, prior to its expiration, the HOME Program

- 12 -

fully satisfied the requirement that dwelling units receiving J-51 benefits shall be subject to rent regulation.

68. With the exception of the HOME IAI Units, which were specifically addressed in the AOD, the remaining 46 HOME Units have no rent stabilized rent history establishing base rent because they were permanently exempt from the ETPA following completion of the Project.

69. A justiciable controversy exists with respect to the allegations set forth above necessitating a declaration of Plaintiffs' rights and remedies in connection with the Buildings' regulatory status and legal rents for the 46 HOME Units.

70. Pursuant to applicable law, upon expiration of the HOME Program, Plaintiffs are entitled to charge prevailing market rents for the 46 HOME Units, which would be registered with the DHCR as the base rents from which future rent-stabilized increases would apply for the duration of J-51 rent regulation.

71. However, although Plaintiffs are entitled to reset the rents for the 46 HOME Units immediately upon expiration of the HOME Program, Plaintiffs are not seeking to immediately reset rents for the 46 HOME Units, but instead to set the legal rent at fair market rent and grant each occupant a preferential rent with increases as set by the Rent Guidelines Board for the lifetime of their tenancy.

72. Therefore, Plaintiffs are seeking a declaration pursuant to 18 U.S.C. § 2201 that, upon expiration of the HOME Program, plaintiff may register legal rent at fair market value, grant existing tenants a preferential rent with increases set by the Rent Guidelines Board for the life of their tenancy and upon vacatur of tenants currently occupying these units, Plaintiffs are authorized to charge prevailing market rents for the 46 HOME Units, which would be registered with the

DHCR as the base rents from which future rent-stabilized increases would apply for the duration of J-51 rent regulation.

## RESERVATION OF RIGHTS

73. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully incorporated herein.

74. Plaintiffs do not waive and specifically reserve all of their rights, claims and defenses as they pertain to Defendants and any other parties in interest in connection with the Buildings.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs as follows:

I. Declaring that the Buildings were "substantially rehabilitated" within the meaning of the ETPA and Operational Bulletin 95-2, which resulted in the permanent removal of all units in the Buildings from ETPA rent regulation jurisdiction;

II. Declaring that, upon expiration of the HOME Program and upon vacatur of tenants currently occupying these units, Plaintiffs are authorized to charge prevailing market rents for the 46 HOME Units, which would be registered with the DHCR as the base rents from which future rent-stabilized increases would apply for the duration of J-51 rent regulation; and

III. Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 7, 2021

**ROSENBERG & ESTIS, P.C.**
*Attorneys for Plaintiffs*

By: _____
Luise A. Barrack
Justin Weitzman
Nicholas Kamillatos
733 Third Avenue
New York, New York 10017
(212) 867-6000

RE\23448\0030\3180245v10